No. 62,035

IN THE MATTER OF THE ADOPTION OF B.C.S. and P.N.S., Minor Children.

(777 P.2d 776)

Opinion filed July 14, 1989.

*William A. Larson*, of Gehrt & Roberts, Chartered, of Topeka, argued the cause and was on the briefs for the appellant.

*John E. Stumbo*, of Stumbo, Stumbo, Hanson & Hendricks, of Topeka, argued the cause, and *Nancy J. Woodworth*, of the same firm, and *Charles E. Andrews, Jr.*, of Topeka, were with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, C.J.: D.S., the natural father of two minor children, B.C.S. and P.N.S., appeals the decision of the Shawnee District Court finding that D.S. failed or refused for two consecutive years to assume the duties of a parent and permitting S.I., the children's stepfather, to adopt them. The principal and controlling issue is whether the findings of fact of the trial court are supported by substantial competent evidence.

The trial judge made extensive findings of fact. Substituting initials for names, those findings are as follows:

" 1. [D.S.] and [J.I.] (formerly [J.S.]) were married on January 7, 1977 in Overland Park, Kansas.

" 2. During the course of their marriage, [D.S.] and [J.I.] had two children, [B.C.S.] born October 18, 1978 and [P.N.S.] born May 7, 1981.

" 3. On December 7, 1982, [D. S.] and [J. I.] were divorced by decree of the Shawnee County District Court.

" 4. The Decree of Divorce provided that [D.S.] was to commence paying child support on August 15, 1985 in the amount of 15 per cent of his gross monthly income. At the time of the divorce [J.I.] agreed to place a moratorium on child support until that date with a proviso that [D.S.] be responsible for the family bills which exceeded $3,000.00. [D.S.] did not pay the bills as ordered, thereby creating a situation where [J.I.] was contacted and pressured by creditors to make payments. She testified that she had made the following payments that should have been made by the respondent: $873.00 to Aetna Finance, $290.00 to Stormont-Vail Hospital, between $200.00 and $300.00 to J. C. Pennys, and $457.83 to MasterCard.

" 5. The Decree of Divorce also provided that [J.I.] was to have custody of [B.C.S.] and [P.N.S.] but her custody of the children was subject to the right of [D.S.] 'to reasonable visitation upon reasonable notice'.

" 6. At the time of the divorce [D.S.] was living in Colorado where he and [J.I.] lived during the latter part of their marriage. When [J.S.] and [D.I.] separated, she moved to Topeka with the children. [D.S.] remained in Colorado where he continues to live today.

" 7. Shortly after the divorce, [D.S.] exercised his rights of visitation by having the boys stay with him in his parents' home in Kansas City during the 1982 Christmas holidays.

" 8. In July, 1983, [D.S.] had the boys for a week in Denver, Colorado where he lived while [J.I.] went on vacation to Hawaii.

" 9. In the fall of 1983 [J.I.] moved for modification of the child support provisions in the Decree of Divorce. An Order was ultimately entered on her motion which in fact modified the divorce decree. The Journal Entry on the motion dated November 10, 1983 provided in part that [D.S.] would pay $100.00 within ten days of the date of the Journal Entry and commence paying child support in the amount of $50.00 per month from December 15, 1983 to August 15, 1985, at which time [D.S.] would pay child support as provided in the original Decree of Divorce.

"10. [D.S.] made the initial $100.00 payment. However, thereafter the only attempt to pay child support until subsequent to the filing of the Petition for Adoption was a $50.00 'hot check' given by [D.S.] in December, 1983, which [J.I.] attempted twice to get cleared without success. [D.S. paid child support in full after filing of petition for adoption.]

"11. For Christmas, 1983, [D.S.] came to Kansas City and had the boys with him at his parents' home for according to his testimony approximately one week.

"12. [D.S.] did make a request for visitations in March of 1984 and December of 84 which were denied by [J.I.].

"13. During 1984 and until April, 1986 when [J.I.] remarried she had an unlisted phone number but her telephone number became known to [D.S.] by his placing of a request for a collect call from her at Christmas of 1984.

"14. In December, 1985, [D.S.] came back to Kansas City and contacted [J.I.] in an attempt to see the children, which she denied.

"15. During 1984 and 1985 [D.S.] testified that he contacted [J.I.] by telephone on a number of occasions in which he would ask to talk to the children on the

phone and she would refuse and in most instances would end the conversation by hanging up. [J.I.'s] testimony on this point was that several of the telephone calls were at one or two a.m. in which he appeared unable to conduct a rational conversation and that he made little or no inquiry on the status of his sons.

"16. The explanation of the natural mother with respect to refusal to visitation was basically as follows: She refused visitation at Christmas in 1984 and 1985 as well as a request to take them to a Royals baseball game in 1987 based on a variety of factors. First, [D.S.] was not contributing anything to the children's support. Second, he'd shown little responsibility in the few visits that [D.S.] had in 1982 and 1983. Also, she communicated to him that he should be more involved in their lives, more than visiting them once a year·and only on occasion he would visit his parents in Kansas City.

"17. [D.S.] did obtain presents for the boys for their birthdays and Christmas in 1984 but all of the same were delivered at the same time at Christmas time. The boys received nothing on their birthdays. [D.S.] did not send any letters, cards or other greetings to the boys from December, 1984 to the date of the trial.

"18. In April of 1986, [J.I.] married [S.I.], who filed Petition for Adoption in May of 1986."

The trial judge's rationale is explained in the concluding portions of her memorandum decision:

" 'In determining whether parent's consent is required under subsection (a)(3) or (4), the court may disregard incidental visitations, contact, communications or contributions.' (K.S.A. 1986 Supp. 59-2102)

"The term 'incidental' has been defined in the case of *In the Matter of the Adoption of McMullen*, 236 Kan. 348[, 691 P.2d 17] (1984) as meaning 'casual, minor importance, insignificant, and of little consequence.'

. . . .

"[I]t is clear that during the crucial two year period the natural father contributed absolutely no financial support under the clear terms of the modification of the divorce decree and within any concept of the common law duty of a parent to support his or her child. It is further clear from all the testimony herein that [D.S.] provided his sons with absolutely nothing in the way of presents, written communication or other forms of emotional support other than the presents delivered at Christmas of 1984. The Court has no difficulty in concluding that such presents in and of themselves constitute only a[n] 'incidental contact' under the statutory rule.

"The record is also quite clear that although the father did have some apparently meaningful visits with his sons during the first year after the separation of the parents, during the two years preceding the filing of the adoption petition he had no visitation nor personal contact with them whatever.

"The real crux of the respondent's case, and therefore, the point of the Court's basic decision herein, is that the father feels the lack of visitation, personal contact and payment of support may be excused on the basis of what he denominates as the mother's refusal of visitation rights. Counsel for the father describes telephone conversations between the natural parents as 'contacts' by the natural father with the children. The Court however feels that such activity can be described only as 'attempts' by the father at contacts and not contacts in and of themselves.

"The Court recognizes the dilemma that non-custodial parents are placed in with regard to on-going relationships with their children as articulated in the case of *In re Adoption of Steckman*, 228 Kan. 669, 620 P.2d 319 (1980). The Court further recognizes that the relevant statute is to be strictly construed in favor of the non-custodial parent.

"However, having seriously considered such factors, the Court feels that the natural father's rationale for refraining from the payment of child support and making other contacts with his children is weak indeed. Though he resided in another state one can imagine a multitude of ways that he could have indicated his interest in and support for his boys both directly and indirectly. The Court is unpersuaded by the father's argument that his former wife 'refused' access to the boys. We believe a more accurate interpretation of her stance is that for quite a period of time she actually encouraged him to have a more meaningful and frequent contact with the children. There did come a time however, that she felt it was not in their best interest to permit contact with a father she considered had gotten remote and whose experience with the boys raised questions in her mind as to their welfare during visitation. If the natural father felt she was unjustified in this position, he certainly had recourse in the Courts. His efforts at this late date to enforce the visitation rights under the Decree come at a point far too late to salvage his cause."

D.S., the natural father, appealed. The Court of Appeals, in an unpublished opinion, "[c]onstruing the statute strictly in favor of " the natural father, found that during the relevant two-year period, D.S. "made several attempts to contact and visit his children, and [J.I.] refused to permit him to do so. The evidence at the hearing was not sufficient to show that [D.S.] had failed or refused to assume the duties of a parent for two consecutive years prior to the filing of the adoption petition by [S.I.]" Accordingly, the Court of Appeals reversed the trial court. We granted the petitioner-stepfather's petition for review.

The statute under which these proceedings were conducted is K.S.A. 1986 Supp. 59-2102. It provides in relevant part:

"(a) Before any minor child is adopted, consent to the adoption must be given by:,. . .

. . . .

"(3) one of the parents, if the other has failed or refused to assume the duties of a parent for two consecutive years . . .

. . . .

"(b) In determining whether a parent's consent is required under subsection (a)(3) . . . the court may disregard incidental visitations, contacts, communications or contributions."

The statute has since been amended, but the provisions quoted above have not been changed. See K.S.A. 1988 Supp. 59-2102.

In the recent case of *In re Adoption of F.A.R.*, 242 Kan. 231, 747 P.2d 145 (1987), where the same statute was under consideration, we discussed a number of rules which are applicable in this appeal. We said:

"In an adoption proceeding, the question of whether an individual has failed or refused to assume the duties of a parent for the required period of time pursuant to K.S.A. 1986 Supp. 59-2102(a)(3) is ordinarily a factual one to be determined by the trier of facts upon competent evidence after a full and complete hearing." Syl. ¶ 1.

"When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the duty of the appellate court extends only to a search of the record to determine whether substantial competent evidence exists to support the findings. An appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below." Syl. ¶ 2.

"Generally speaking, adoption statutes are strictly construed in favor of maintaining the rights of natural parents in those cases where it is claimed that, by reason of a parent's failure to fulfill parental obligations as prescribed by statute, consent to the adoption is not required." Syl. ¶ 5.

"In making a determination in an adoption proceeding of whether a nonconsenting parent has failed to assume his or her parental duties for two consecutive years, all the surrounding circumstances must be considered." Syl. ¶ 6.

"In making a determination pursuant to K.S.A. 1986 Supp. 59-2102(a)(3), the critical period is limited to the two years immediately preceding the filing of the adoption petition. However, it is not error for the trial court to admit evidence of events occurring prior to that period to the extent it is relevant to explain or prove conduct or lack thereof during the two-year period." Syl. ¶ 9.

The background facts, extending beyond the two-year period, are important in the case now before us. The natural father argues that the mother would not let him see the children, hence he did not pay child support. The facts, however, disclose that from the time the divorce was granted on December 7, 1982, until the adoption petition was filed on May 23, 1986, D.S. made one payment of $100 in November, 1983; otherwise, he paid nothing toward the support of his children. He made little, if any, attempt to live up to his obligations as a father. He was at first excused from the payment of child support on the condition that he pay some of the debts existing at the time of the divorce. He did not pay those obligations; the mother was required to assume and pay almost two-thirds of them, while furnishing full support for the boys. The court then required that he pay child support. He did not pay it. The mother encouraged him to see the children more frequently than once a year when he came to this

area to see his parents; he did not do so. His total effort to pay support, prior to the filing of the adoption petition, consisted of one $100 payment and one "hot" check. During the critical two-year period, his total effort for the benefit of his children consisted of Christmas and birthday gifts, delivered all together at Christmas time, and a few telephone calls. Several of those, according to the mother, were made at one and two o'clock in the morning when he "appeared unable to conduct a rational conversation and . . . made little or no inquiry on the status of his sons."

The trial judge is in the best position to evaluate the testimony of the witnesses, and we will not reweigh the evidence, substitute our evaluation of it for hers, or pass upon the credibility of the witnesses. The trial judge obviously concluded that the natural father's failure to support his children or to exhibit any substantial, genuine interest in their well-being occurred long before the mother refused him permission to see the children and was not a result of that action. The evidence supports that finding.

After K.S.A. 59-2102 was amended in 1982 to include language authorizing courts to "disregard incidental visitations, contacts, communications or contributions," we decided the case of *In re Adoption of McMullen*, 236 Kan. 348, 691 P.2d 17 (1984). In that case, the natural mother was seeking to prevent the adoption of her two minor children. Her contact during the relevant two-year period included sending the children a total of $25, two small gifts, and a few greeting cards. She did not see them during that period, nor did she talk to them or write them letters or inquire about their health or well-being. The trial court held these contacts to be incidental, and granted the petition for adoption. The mother appealed, and we affirmed. We held that "incidental" means "casual, of minor importance, insignificant, of little consequence." 236 Kan. 348, Syl. ¶ 1. We agreed with the trial court that the mother's contacts were merely "incidental."

Many of our other cases could be reviewed, but such a review would merely prolong this opinion. The principles laid down in the cases discussed above are controlling here. The facts are disputed, but the trial court heard all of the evidence, considered it, and made extensive findings of fact, all of which are supported by substantial evidence.

D.S. contends that the trial court failed to construe K.S.A. 1986 Supp. 59-2102(a)(3) in favor of the nonconsenting natural parent. As we noted in *In re Adoption of F.A.R.*, 242 Kan. 231, quoted at length above, adoption statutes are strictly construed in favor of maintaining the rights of natural parents where it is claimed that, by reason of a parent's failure to fulfill parental obligations, consent to the adoption is not required. Strict construction, however, does not require a court to ignore substantial competent evidence of failure on the part of a parent to fulfill his or her obligations. Such a construction would eliminate the obvious intent of the statute.

We do not encourage or condone a custodial parent's interference with or denial of contacts by a noncustodial parent with his or her children. However, under the facts of this case, the mother's denial of visitation came long after the father had chosen not to support his children and did not precipitate his failure to support them.

This is essentially a fact case. The trial court's findings of fact are supported by substantial competent evidence and are sufficient to support its conclusions of law.

The judgment of the Court of Appeals reversing the trial court is reversed, and the judgment of the trial court is affirmed.